Argued January 9, affirmed January 30, 1975

OLIVER, *Appellant, v.* BURLINGTON
NORTHERN, INC., *Respondent.*

531 P2d 272

*George M. Joseph,* of Bemis, Breathouwer & Joseph, Portland, argued the cause for appellant. With him on the brief was Douglas S. Querin, of Reiter, Wall, Bricker & Zakovics, P. C., Portland.

*Delbert W. Johnson,* Portland, argued the cause for respondent. With him on the brief was Gary H. Peterson, Portland.

Before O'CONNELL, Chief Justice, and DENECKE, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

HOLMAN, J.

Plaintiff brought an action against his employer under the Federal Employers' Liability Act (45 USC § 51 *et seq.*) for damages resulting from personal injuries suffered during his employment. He received a judgment based upon a jury verdict in the sum of $44,000. On defendant's motion the trial court ordered a remittitur in the sum of $20,000 or, in the alternative, a new trial. There was a stipulated loss of wages in the sum of $9,000; therefore, the remittitur resulted in a reduction in the amount awarded by the jury for plaintiff's injuries, disability and suffering from $35,000 to $15,000. Plaintiff appeals, claiming the trial judge erred in granting the remittitur or, in the alternative, a new trial.

The manner in which the injury occurred is irrelevant to the issues in this appeal. The only issues are the proper criteria to be applied by a trial judge in determining whether a remittitur should be granted,

whether the trial judge applied these criteria, and whether the trial judge abused his discretion.

We will proceed to the first issue of the proper criteria to be applied by the trial judge. In two fairly recent cases we have used different language in discussing the subject. In *Sandow v. Weyerhaeuser Co.,* 252 Or 377, 379, 449 P2d 426 (1969), we said:

"* * * [T]he trial court has the authority to grant a new trial, unless plaintiff files a remittitur, when the judgment exceeds any rational appraisal. *Hust v. Moore-McCormick Lines, Inc.,* 180 Or 409, 435-36, 177 P2d 429 (1947). * * *."

In *McMahan v. States Steamship,* 256 Or 554, 556, 474 P2d 515 (1970), *cert. denied,* 401 US 956, 91 S Ct 977, 28 L Ed 2d 239 (1971), we quoted with approval:

"* * * unless the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate."

■ In both *Sandow* and *McMahan* we sustained a remittitur which had been granted by the trial judge. Though different language is used in the two cases, it is apparent that the same general idea is being expressed. Our experience in attempting to define gross negligence has demonstrated that, at best, descriptions of a difference of degree in an inexact concept are doomed to further inexactness. The use of more words in an attempt to describe exactly that which is incapable of exact description would be counterproductive.

In both *Sandow* and *McMahan* we also said that the application of the test to the facts of a particular case is a matter within the discretion of the trial judge, for which he will not be reversed unless it can

be demonstrated that there was a clear abuse of discretion. *McMahan v. States Steamship, supra* at 556-57; *Sandow v. Weyerhaeuser Co., supra* at 379. We described the discretionary authority of the trial court in another manner in *Staples v. Union Pacific R.R. Co.*, 265 Or 153, 155, 508 P2d 426, 427 (1973) by using the following language:

"* * * [T]he trial court will not be reversed for denying remittitur unless the appellate court is of the opinion that the amount of the verdict is 'outrageous,' 'shocking' or 'monstrous.' * * *."

■ Plaintiff contends the trial judge applied the wrong criteria as demonstrated by the statements he made from the bench. Although he said many things, we believe the trial judge had the proper criteria in mind, since he said:

"Now with all these circumstances, the Court could not feel there was any rational basis for the verdict returned."

■ We now turn to the evidence of plaintiff's injuries, sufferings and disability. At the time of the injury plaintiff asked to go to the hospital; his left wrist was swelling and he was "hurting pretty badly" and was "almost in shock." After having his wrist x-rayed, he was told he could return to work the next day. However, the next day, Friday, his arm and wrist were so badly swollen he could hardly move them; thereupon, he went to his own doctor who also x-rayed his wrist. Neither x-ray disclosed any fracture. The following Monday he went back to work where he remained about a month, but he continued to experience difficulty with his wrist. Finally, he made an appointment with Dr. Butler, a third doctor, who also x-rayed him and found that he had suffered a fracture of the

carpel scaphoid, which is a small bone in the wrist. The fracture was not displaced and did not have to be reduced. The doctor described it as "simply a small line in the bone."

Plaintiff's wrist was put in a cast which ran from his elbow to the base of his fingers to prevent motion. It remained in the cast for 18 weeks. This was not an abnormal time for such an injury, but before the wrist was immobilized, bone had worn away which delayed the healing process. When the cast was removed plaintiff had stiffness due to the long period of immobilization. Dr. Butler testified that although plaintiff had the full motion of his left wrist after the stiffness wore off, he still experienced some tenderness and pain when he held it in certain positions, one of which was when he used a strong grip. Plaintiff is right-handed.

Dr. Butler also testified that whenever there is a fracture in a joint there is always the possibility of traumatic arthrosis, which is a premature wearing away process. He wrote a report to plaintiff's lawyer in which he said:

"I would say that the possibilities of significant future disability or necessity of surgery would be remote."

By this he testified he meant there would be no disability which would require surgery. He also wrote:

"On the question of permanent partial disability, again it is very difficult to say. I don't think there is anything objectively rateable with regard to a disability and we are then dealing with a subjective element of pain which, possibly, would represent some degree of permanent partial disability."

He testified that by "rateable" he was referring primarily to loss of motion as used in rating under compensation plans. He also testified:

"Q Now, Doctor, based on his history, as well as your findings, and also based upon reasonable medical probability, and taking into consideration the type of work Mr. Oliver does, will you express an opinion as to whether you expect him to have permanent partial disability as a result of this incident?

"A Well, yes. In trying to think about this beforehand, it's very difficult to look ahead, but again, we have had a fracture on a joint surface, and in the face of that, we will have some partial disability that is permanent.

"Q Doctor, again taking into consideration the fact that you have a man working with his hands, how do you expect this disability to manifest itself?

"A By primarily an increase of pain, and almost loss of motion.

"Q By 'loss of motion' what do you mean?

"A The scaphoid is the keystone to the wrist, primarily referred to, and if you have some irregularity you are not likely to have normal motion, particularly flexing motion and extension motion."

Plaintiff testified that when his wrist was in the cast it hurt quite a lot—more at some times than at others. He said his wrist bothered him at work, but he just gritted his teeth and went on. When he lifted pins (a railroad term) there was a cramping on the right side of his hand and it hurt when he applied hand brakes. Driving, shoveling, and chopping with an ax bothered him, as did engaging in his hobby of archery. At times it hurt at night when he was in bed. He has worked regularly since his return to work.

Plaintiff's wife testified that plaintiff has trouble

in using his hands and in lifting. She has seen him almost drop his two-year-old grandchild as well as a coffee pot. She said he could pull a bow but not as well as before. She now does most of the work in the yard.

Although the medical testimony is unclear, we conclude that a reasonable analysis of the testimony would permit a factfinder to conclude that plaintiff has a full range of motion in his wrist, there is a possibility of future traumatic arthrosis, and he will suffer some pain in the future when he uses his wrist in certain ways. In such circumstances it is our opinion that the record does not disclose a clear abuse of discretion by the trial judge in finding there was no rational basis for the verdict returned. We could, again, use more words in an attempt to justify our opinion, but in the inexact fields of a trial judge's discretion and a claimant's extent of disability, we do not believe any additional lucidity would result.

The judgment of the trial court is affirmed.

TONGUE, J., dissenting.

I agree with the majority that in actions under the Federal Employers' Liability Act (45 USC § 51 et seq), a trial judge may not be reversed for granting a remittitur of a portion of the amount awarded by a jury verdict unless there has been an abuse of discretion by the trial judge.

Because of the size of the jury verdict in this case, when considered in the light of the nature and extent of plaintiff's injuries, I would also agree that there would be no proper basis for reversal of the exercise of discretion by this trial judge; provided, however, that he had exercised that discretion in accordance

with and by application of the proper rules and standards applicable in such cases.

As held in *State v. Lewis,* 113 Or 359, 364, 230 P 543, 232 P 1013 (1924):

"\* \* \* Discretion \* \* \* is not an arbitrary and unrestricted power, but must be exercised according to fixed and settled rules."

Indeed, as noted by the majority:

"\* \* \* The only issues are the proper criteria to be applied by a trial judge in determining whether a remittitur should be granted, whether the trial judge applied these criteria, and whether the trial judge abused his discretion."

As to the first question, i.e., what are the "proper criteria" to be. applied, the majority correctly points out that in the latest case decided by this court on this question, *Staples v. Union Pacific R.R. Co.,* 265 Or 153, 155, 508 P2d 426 (1973), we held that in such a case:

"\* \* \* [T]he trial court will not be reversed for denying remittitur unless the appellate court is of the opinion that the amount of the verdict is 'outrageous,' 'shocking' or 'monstrous.' \* \* \*"

The majority also recognizes that three years earlier, in *McMahan v. States Steamship,* 256 Or 554, 556, 474 P2d 515 (1970), *cert denied,* 401 US 956, 91 S Ct 977, 28 L Ed 2d 239 (1971), this court approved, as a "proper test to be applied" in such cases, the criteria as stated in *Taylor v. Washington Terminal Co.,* 409 F2d 145 (DC Cir 1969), to the effect that a remittitur should not be granted:

"\* \* \* unless the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate."

The majority, however, is unable to perceive any difference between these tests or criteria and those stated in an earlier decision in *Sandow v. Weyerhaeuser Co.*, 252 Or 377, 379, 449 P2d 426 (1969), in which it was said that in such cases:

> "* * * [T]he trial court has the authority to grant a new trial, unless plaintiff files a remittitur, when the judgment exceeds any rational appraisal. *Hust v. Moore-McCormack Lines, Inc.*, 180 Or 409, 435-36, 177 P2d 429 (1947). * * *"[1]

The majority says that these three tests or criteria all express "the same general idea"; that "descriptions of a difference of degree in an inexact concept are doomed to further inexactness"; and that "[t]he use of more words in an attempt to describe exactly that which is incapable of exact description would be counterproductive."

I most respectfully disagree. I fully recognize the difficulty in "exact description" of the proper test to be applied in such cases. Many valid legal concepts, however, are not susceptible to "exact description." Thus, it has been truly said that "[b]ecause [a] concept is hard to define does not mean that it does not exist. Beauty defies definition but few would dispute that some women are prettier than others."[2]

It is the frequent function of the courts to attempt to put abstract concepts into words in terms sufficient

---

[1] In *Hust v. Moore-McCormack Lines, Inc.*, 180 Or 409, 436, 177 P2d 429 (1947), this court said that a remittitur in such a case is proper if the court is convinced:

> "* * * that the verdict *substantially* exceeds any rational appraisal or estimate of the damages * * *."

[2] Lacy, Torts—1960 Oregon Survey, 40 Or L Rev 278, 283 (1961), in discussing the refusal of this court to give meaning to the term "gross negligence."

at least to convey "differences of degree." We cannot abdicate this duty, in my opinion, on the ground that a case involves a "difference of degree in an inexact concept."[9]

Indeed, it might be suggested by some that this holding by the majority, if not a confession of impotence to deal with such problems, is one which indicates a willingness by the court to refuse to distinguish between concepts which it may consider to be "abstract" or "inexact" in any given case.

Thus, in another recent case the majority also equated, in effect, the formerly well-established rule of statutory construction to the effect that the courts must give effect to plain and unambiguous terms of a statute adopted by the legislature unless to do so would lead to an "impossible or absurd result," with the rule, as now adopted by it, to the effect that the Oregon courts may refuse to give effect to plain and unambiguous terms of a statute adopted by the legislature whenever such an application of the words of a statute would bring about what the court considers to be an "unreasonable result." See *Johnson v. Star Machinery Company*, 270 Or 694, 530 P2d 53 (1974), and dissenting opinion (at 61).

See also *Comm. to Retain Judge Tanzer v. Lee*, 270 Or 215, 527 P2d 247 (1974), including dissenting opinion, in which a majority of this court, fearing that "distinctions" which it considered to be "important only to lawyers" would "lead the court into a linguistic quagmire," declined to apply in an election corrup-

---

[9] As an example, the difference between the burden of proof "by a preponderance of the evidence" and "beyond a reasonable doubt." See Cook v. Michael, 214 Or 513, 330 P2d 1026 (1958).

tion practices case the usual rules of fraud applied in a civil action for fraud and, in doing so, set aside the verdict of the jury in that case.

To me, the test most recently approved by this court, to the effect that a trial judge may not grant a remittitur in such a case unless he can say affirmatively that the amount of the verdict is "outrageous," "shocking," or "monstrous," although perhaps "inexact," is far more limited, as a matter of degree, than the earlier language of *Sandow* under which a trial judge may do so if in his opinion the verdict exceeds "any rational appraisal."

Indeed, it appears from the record in this case, as noted below, that the trial judge in this case expressly recognized a distinction between the two tests.

In any event, it is also clear from the record, in my view, that the trial judge misapplied the "any rational appraisal" test, even assuming that it is a proper test, because he undertook to apply that test by considering whether, in his opinion, and as a purely *subjective* matter, the verdict was so high as to be "unreasonable."

Thus, when defendant submitted its motion to set aside the verdict of the jury in this case as "excessive" it submitted a proposed order reciting that the verdict was "*so grossly excessive as to shock the court* and indicate *clearly* that the verdict was given under the influence of passion and prejudice"—in terms which correctly stated the test adopted by this court in *Staples.*

The trial judge, however, then deleted the words "so grossly," "as to shock the court" and "clearly," so that the order then recited only that the "jury ver-

dict is excessive and indicates that the verdict was given under the influence of passion and prejudice."

In doing so the trial judge expressly stated that "I do not believe that the court found that the jury verdict shocked the court," but that he "felt there was no rational basis for a verdict of that size." He also stated, however, that in his view the question to be determined upon the application of that test was "what would be fair, reasonable and adequate general damages to the plaintiff." By the application of that wholly subjective test, the trial judge then concluded that the verdict awarded by the jury was excessive and was given "under the influence of passion and prejudice."

It is well established in Oregon that "the mere size of a verdict" is not sufficient "to establish that it was given under passion and prejudice." *Lane v. Stewart,* 221 Or 293, 307, 351 P2d 73 (1960). See also *Van Lom v. Schneiderman,* 187 Or 89, 94, 210 P2d 461 (1949). Indeed, no contention is made by defendant that there was any incident during the course of this trial that could have aroused the "passion or prejudice" of the jury.

It has also been a "rule of thumb" among attorneys and adjusters in negotiating settlement in personal injury cases, at least in years past, that an award of general damages in an amount equal to three or four times the amount of special damages is one "within the range" of a proper settlement.

In this case, the special damages totaled $9,000. The result of the remittitur is to allow $15,000 in general damages. The jury, in awarding a total of $44,-

000, awarded $35,000 in general damages, or slightly less than four times the amount of the special damages.

Accordingly, the trial judge was quite correct in stating that the verdict was not so high as to "shock the court." For the same reasons, it is clear that it was not so high as to be "outrageous" or "monstrous," under the test most recently adopted by this court in *Staples* and that it did not "exceed the maximum limit of a reasonable range within which the jury [could] properly operate," under the test adopted in *McMahan*.

Indeed, and for those same reasons, it cannot properly be said, in my opinion, that such a verdict "exceeded *any* rational appraisal" for the purposes of the previous test as stated in *Sandow*.

What the majority has decided in this case, in my opinion, is to approve the conduct of a trial judge who has undertaken to decide for himself, on a wholly subjective basis, "what would be fair, reasonable and adequate general damages to the plaintiff," and thus to substitute his judgment for that of the jury on this issue of such vital importance to the concept of the right to trial by jury in actions at law. By doing so in this case the majority has also, in my opinion, repudiated in effect, if not by express decision, the tests most recently adopted by this court in *Staples* and in *McMahan*.

Although the immediate effect of this opinion is limited to actions under the Federal Employers' Liability Act, the ultimate results of this most recent exercise of the power of Oregon courts to set aside jury verdicts considered by them to be "unreasonable" remain to be seen. Cf. *Palmer v. Van Petten Lumber*

*Co.,* 265 Or 347, 350, 509 P2d 420 (1973), including dissenting opinion (at 378-83).

Although I would concur in a decision that would remand this case to the trial court, with instructions to reconsider its previous order by the application of the tests and criteria as stated in *Staples* and *McMahan,* I cannot agree with the majority in this case.

For these reasons, I must respectfully dissent.